**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**MARTINSBURG**

**JENNIFER BARRETT,**

　　　　　　　　Plaintiff,

**v.**

**NANCY A. BERRYHILL,**
**Acting Commissioner of Social Security,**

　　　　　　　　Defendant.

**CIVIL ACTION NO.: 3:16-CV-160**
**(GROH)**

## REPORT AND RECOMMENDATION

### I.  INTRODUCTION

This case arises from the denial of Plaintiff Jennifer Barrett's ("Plaintiff") Title II application for a period of disability and disability insurance benefits ("DIB") and Title XVI application for supplemental security income ("SSI"). After Plaintiff's application proceeded through the administrative process, a United States Administrative Law Judge ("ALJ"), Geraldine H. Page, concluded that Plaintiff was not disabled within the meaning of the Social Security Act. Plaintiff's request for review by Appeals Counsel was denied, making the ALJ's decision the final decision of Defendant Nancy A. Berryhill ("Commissioner"), the acting Commissioner of Social Security. Now, Plaintiff seeks judicial review of the Commissioner's decision. Because the Commissioner's final decision to deny Plaintiff's claim for DIB and SSI is supported by substantial evidence, the undersigned reports and recommends that Plaintiff's Motion for Summary Judgment be denied and Defendant's Motion for Summary Judgment be granted.

## II. <u>PROCEDURAL HISTORY</u>

On or about March 21, 2013, Plaintiff filed a claim for disability, DIB and SSI, alleging that her disability began on June 30, 2009. R. 295–300. Plaintiff's claims were denied initially on October 18, 2013, R. 155–60, 161– 65, 166–71, 172–76, and denied on reconsideration on January 2, 2014, R. 179–81, 182–84. After these denials, Plaintiff filed a written request for a hearing. R. 185–86. On September 1, 2015, a hearing was held by videoconference before the ALJ who presided from Roanoke, Virginia. R. 19, 35–69. Plaintiff, represented by counsel Natalie Hall, Esq., appeared in Martinsburg, West Virginia, and David Owens, M.D., an impartial physician, Gary T. Bennett, Ph.D., an impartial psychologist, and Marilyn Stroud, an impartial vocational expert, appeared by telephone. R. 19. Approximately two months later, the ALJ issued a decision concluding that Plaintiff was not disabled within the meaning of the Social Security Act. R. 19–29. On September 26, 2016, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. R. 1–4.

On November 28, 2016, Plaintiff, through counsel, filed a Complaint in this Court to obtain judicial review of the Commissioner's final decision pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) (2015). Compl., ECF No. 1. The Commissioner, through counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed her Answer and the Administrative Record of the proceedings on April 12, 2017. Answer, ECF No. 8; Admin. R., ECF No. 9. Soon thereafter, Plaintiff and the Commissioner filed their Motions for Summary Judgment and their supporting briefs on May 17, 2017 and June 15, 2017, respectively. Pl.'s Mot. Summ. J., ECF No. 12; Def.'s

Mot. Summ. J., ECF No. 15. On September 6, 2017, the Court heard oral argument on the parties' cross motions for summary judgment.

The matter is now before the undersigned United States Magistrate Judge for a Report and Recommendation to the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule of Civil Procedure 9.02(a). Having reviewed the parties' motions and the administrative record, and having heard oral argument, the undersigned now issues the following Report and Recommendation.

## III.    BACKGROUND[1]

### A.    Personal History

Plaintiff was born on April 23, 1969, and she was forty-three years old at the time she filed her claim for DIB and SSI. See R. 295–96. She is 5'4'' tall and weighs approximately 168 pounds. R. 41. She lives in a house with her boyfriend. R. 327, 340. She completed two years of college but has not received a degree. R. 38–39. Before and after filing her claim for DIB and SSI, Plaintiff worked part time as a sales person at Goodwill. R. 39, 64. Plaintiff claims that she is unable to work due to anxiety, carpal tunnel, neck and back pain, depression, panic disorder, depression and fibromyalgia. R. 319.

---

[1] On August 17, 2017, the Court ordered Plaintiff to file her proposed stipulation of facts. Order, ECF No. 17. Plaintiff filed said stipulation, as directed, and the Commissioner filed her timely response noting her objections and additions. Pl.'s Proposed Stipulation of Facts, ECF No. 18; Def.'s Resp. to Pl.'s Proposed Stipulation of Facts, ECF No. 23. The Commissioner agreed to the proposed facts set forth in paragraphs 1–7, 9–13, 15–17, 19, 21–24, 26–29, 33, 35, 38, 40–47 and 49–50. ECF No. 23 at 1. In addition, the Commissioner agreed, in part, to the proposed facts set forth in paragraphs 8, 18, 25, 30–32, 34, 36–37, 39 and 48. Id. at 1–4. Accordingly, the facts set forth in Section III.B.1 are the relevant, stipulated facts, as forth by the parties, as well as the Court's resolution of any disputed facts.

**B.    Medical History**

**1.  Medical History Post-Dating Alleged Onset Date of June 30, 2009**

In February 2011, Plaintiff was evaluated at the Eastern Panhandle Free Clinic. There, she was diagnosed with anxiety and prescribed Prozac. R. 437–40. The following month, during a follow up visit, Plaintiff was diagnosed with anxiety and allergic rhinitis. R. 441–43. However, Plaintiff's anxiety was considered "controlled" with medication, and she was doing Wii Zumba for daily exercise. R. 442–43. In June 2011, Plaintiff was noted to have high cholesterol and was prescribed Flexeril for neck and back pain. R. 444–45. But Plaintiff's anxiety was described as stable. R. 445.  Several months later, in September 2011, Plaintiff reported chronic lower back pain and thigh spasms bilaterally, which were not relieved by Flexeril. R. 446. However, Plaintiff's physical examination findings, including her musculoskeletal findings, were normal. R. 447.

In January 2012, Plaintiff reported breaking her right humerus and continued chronic lower back pain. R. 449–50. Also, Plaintiff stated that her anxiety was well controlled; she had no depression; and she denied suicidal or homicidal ideations. R. 449. Her physical examination was generally normal with the exception of her right upper extremity. R. 450. Plaintiff had full strength in all extremities; she had strong hand grip; she could squat and rise without difficulty; and she had a normal station and gait. R. 450. Also, Plaintiff's anxiety was described as "controlled," R. 450, and Plaintiff reported doing Wii Zumba four times per week for regular exercise, R. 452. In February 2012, Plaintiff's physical examination was normal and her follow-up visits in April and May were unremarkable. R. 453–61.

Several months later in June, Plaintiff sought acute care because of neck and back pain. She reported occasional back pain, rated 10 out of 10 at the time of her visit. R. 462–64. She was prescribed Flexeril and Celebrex, referred to physical therapy and advised to go to charity care for a lumbar X-ray. R. 462–64. In July, Plaintiff twice underwent physical therapy treatments for her lower back pain at Jefferson Memorial Hospital. She was discharged from treatment on July 23, 2012, for non-compliance. R. 398-400.

In September 2012, Plaintiff was evaluated by Dr. Ali Asghar. Dr. Asghar noted that she was anxious, and she was diagnosed with Panic Disorder, with Agoraphobia. R. 410. Her Global Assessment of Functioning ("GAF") was initially rated at 55. R. 410. Later that year, in December, Plaintiff was treated at the Emergency Department of West Virginia University Hospital-East for lower back pain, which was rated 8 out of 10. R. 385. X-rays of the lumbar spine revealed minimal multi-level degenerative disc disease, as well as sequelae of chronic pancreatitis. R. 385–93. She was provided pain medication and released. R. 388. Three days later, Plaintiff was evaluated at the Eastern Panhandle Free Clinic with complaints of recurrent lower back pain. R. 466, 588–91. She reported that the Oxycodone she had received from the emergency room visit was ineffective. R. 467.

In January 2013, Plaintiff had a routine physical examination. R. 470–73. Although she complained of bilateral knee and shoulder pain, Plaintiff's physical examination was entirely normal. R. 471. Plaintiff followed up later that month to refill her medications. R. 474–78.

In February 2013, Plaintiff underwent a psychiatric evaluation by Dr. Jafar T. Almashat. R. 407–08. Dr. Almashat reported that Plaintiff had a long history of recurrent panic attacks and recurrent depression, with recurrent crying spells, decreased motivation, and concentration, and poor sleep. R. 407–08. He diagnosed Plaintiff with Panic Disorder, without Agoraphobia, Major Depressive Disorder, recurrent, moderate, Post-Traumatic Stress Disorder, chronic, and Alcohol Dependence and Cannabis Dependence, both in sustained, full remission. R. 407–08, 523–24. During a follow up visit with Dr. Almashat the following month, Plaintiff reported feeling better. R. 409. Her GAF score was 65. R. 409, 525.

In April, Plaintiff was evaluated at the Eastern Panhandle Mental Health Center. R. 413–24, 425–34, 528–49. Her diagnoses included Major Depressive Disorder, Recurrent, Moderate, Panic Disorder, without Agoraphobia, Post-Traumatic Stress Disorder, and Alcohol Dependence and Cannabis Dependence, both in remission. R. 413, 431–32. She acknowledged moderate symptoms, R. 417, but her mental status examination was reported as normal. R. 418–19, 429–30.

In May, Plaintiff saw Dr. Almashat for a follow up visit. Plaintiff's diagnoses and functioning assessment remained unchanged. R. 513. That same day, Dr. Almashat completed a Mental Residual Functional Capacity Statement that indicated, among other things, that Plaintiff would be off task twenty-five percent of an eight hour workday. R. 480–84, 561–64. However, Dr. Almashat also opined that Plaintiff had no limitation in her ability to understand and remember very short and simple instructions, carry out very short and simple instructions, interact appropriately with the general public, ask simple questions and respond appropriately to criticism from supervisors, maintain

socially appropriate behavior, adhere to basic standards of neatness and cleanliness, travel in unfamiliar places, use public transportation, set realistic goals or make plans independently of others. R. 562–63.

The following month, Plaintiff returned to the Eastern Panhandle Free Clinic to refill her medication. R. 489–91, 584–86. She reported that her medication was not controlling her back pain because she experienced occasional shooting pains down her legs, bilaterally. R. 489, 584. In addition, Plaintiff said that her mood was "okay" and denied suicidal or homicidal ideations. R. 489. On examination, Plaintiff was alert and oriented; her affect was appropriate; and her judgment, insight and recall were intact. R. 490. She was prescribed Daypro and a Lidoderm patch. R. 490, 585.

In July 2013, Plaintiff underwent a consultative mental status examination with Randolph R. MacDonald, Ed.D. R. 485–87. Dr. MacDonald reported that Plaintiff was anxious with a restricted affect. R. 486. She denied suicidal or homicidal thoughts; her speech was normal in pace, tone, and volume; her mood was anxious; her affect was restricted; her thought content seemed clear; her cognitive capability was deemed average; her insight and judgment were good; her immediate memory was good; her recent memory was fair; and her remote memory was good because she had a clear recollection of her own personal history. R. 486. Despite those observations, Dr. MacDonald diagnosed Plaintiff with Panic Disorder, Major Depressive Disorder and Recurrent, Moderate and Chronic Post-Traumatic Stress Disorder. R. 487.

Also in July, Plaintiff returned to the Eastern Panhandle Free Clinic for a follow-up appointment. Plaintiff reported doing well and being pleased with pain control. R. 582–83. Her medications were renewed. R. 582–83.

In August 2013, Plaintiff was transferred from Dr. Almashat and saw Dr. Tayyab Paracha at the Community Mental Health Center. R. 514–16. There, Plaintiff was appropriately dressed, cooperative and kept good eye contact. R. 514. Dr. Paracha noted that there was no psychomotor agitation or retardation and Plaintiff's speech was normal in tone, rate and volume. R. 514. Further, Plaintiff's mood was good; her affect was mood congruent; her thought process was linear and goal oriented; she was oriented; her gait was normal; and her insight and judgment were good. R. 514. In short, her diagnoses and functioning assessment were unchanged. R. 514–16.

In October 2013, Plaintiff saw Dr. Robert F. Webb for a consultative physical examination. R. 494–97. Dr. Webb reported that Plaintiff had lower back pain when getting up from a chair and her arms held out. R. 495. Her gait was stable, and her hands were warm and red. R. 495. She had lower back pain at 70 degrees of straight leg raising bilaterally, 1+ ankle reflexes bilaterally and was tender over the entire lumbar spine. R. 496. She was capable of heel/toe walking and could squat with assistance. R. 496. The strength of her lower extremities was 4/5 out of 5. R. 496. Dr. Webb diagnosed Plaintiff with chronic pain syndrome, possible bilateral carpal tunnel syndrome, post-traumatic stress disorder with chronic anxiety, depression with history of panic episodes and nightmares and sleep disorder. R. 495–96.

Five days later, Plaintiff was evaluated at Jefferson Medical Center for lower back pain and red, itchy eyes. R. 503–05, 625–36. Her extremities were normal; she had no significant cervical or thoracolumbar spine findings; she had no deformities; she had full range of motion in all extremities; she had no peripheral edema; her sensation was intact; and her motor examination was normal in all extremities. R. 628. Plaintiff

was diagnosed with lower back pain and conjunctivitis and prescribed Mobic and Erythromycin Ointment. R. 503–05, 625–36.

In December, two months later, Plaintiff went to the Eastern Panhandle Free Clinic to refill her medications. There, she complained of neck and shoulder pain, but her medicated anxiety was under control. R. 577–78. Later that month, Plaintiff saw Dr. Paracha for a follow-up appointment. At the appointment, Plaintiff was appropriately dressed, cooperative and kept good eye contact. R. 551. There was no psychomotor agitation or retardation. R. 551. Plaintiff's speech was normal in tone, rate and volume; her mood was good and her affect was mood congruent; her thought process was linear and goal oriented; and her insight and judgment were good. R. 551. Finally, Dr. Paracha noted that Plaintiff was stable on her medications and only had one panic attack since her last visit. R. 517–19, 551–53. Later that month, Plaintiff returned to the Eastern Panhandle Free Clinic with complaints of body aches, hand numbness and fatigue after working a six hour shift at Goodwill. R. 574. Plaintiff's Daypro was ineffective, and she was diagnosed with fibromyalgia and prescribed a trial of Cymbalta. R. 574.

In January of the following year, Plaintiff was evaluated at Jefferson Medical Center for abdominal pain. R. 648–70. She was diagnosed with a fibroid or a dermoid cyst and referred for an MRI examination. R. 654. Next month, Plaintiff underwent bilateral hip X-rays, which were normal. R. 674. She also underwent lumbar spine X-rays, which demonstrated minimal degenerative end plate changes at L2-3, L3-4 and L4-5 and chronic pancreatitis. R. 675. In April 2014, Plaintiff underwent an MRI examination of her lumbar spine. The MRI revealed minimal degenerative end plate changes at L2-3, L3-4 and L4-5. R. 914.

In May 2014 and August 2014, Plaintiff saw Dr. Paracha for follow-up appointments. There, Plaintiff reported that she was doing well and was not experiencing any side effects from her medications. R. 554–59. That July, Plaintiff underwent an MRI examination of her cervical spine, which revealed mild degenerative changes at C3-4, C5-6 and C6-7, a posterior disc osteophyte complex at C5-6, which effaces the thecal sac, with mild to moderate bilateral neural foraminal narrowing, left greater than right, and a posterior disc osteophyte complex at C6-7, which effaces the thecal sac, with mild central canal narrowing. R. 715, 912. In August, Plaintiff underwent carpal tunnel release surgery on her right hand. R. 754–55, 756–57, 737–818.

In October 2014, Plaintiff underwent a Functional Capacity Evaluation. R. 834–46, 889–902. There, Plaintiff had decreased strength, activity tolerance and fine motor coordination. R. 835. She had functional limitations with walking, material handling, elevated work, forward bend standing, crouching, kneeling, managing stairs and ladders and with productive hand use. R. 835. Plaintiff could occasionally lift five to ten pounds and could not frequently lift any weight. R. 836. She could occasionally bend, use stairs and walk and could stand without limitation. R. 837. On the Purdue Pegboard test, Plaintiff scored in the zero to first percentile. R. 838. On the Minnesota Rate of Manipulation Test, Plaintiff scored in the first percentile. R. 838. Also, Plaintiff had an abnormal gait, R. 840, and she could only stand for a short period of time. R. 842. Finally, her range of motion was mostly within normal limits. R. 840–42.

From January 2015 to March 2015, Plaintiff went to physical therapy at Bolivar Harpers Ferry Physical Therapy. R. 925–32. That February, Plaintiff underwent a pain management evaluation at Shenandoah Preventative Medicine, Inc. There, her lumbar

range of motion was significantly limited, with forward flexion limited to 15 degrees and positive straight leg raising tests bilaterally at 45 degrees. R. 922. Plaintiff also attended regular follow-up appointments from February 2015 to August 2015. R. 940–78. She was prescribed narcotic pain relievers, including MS Contin and Percocet, without significant relief of her chronic pain. R. 940–78.

### 2. Medical Reports/Opinions

#### a. Disability Determination Explanation by Fulvio Franyutti, M.D., October 17, 2013

On October 17, 2013, Fulvio Franyutti, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Initial Level ("Initial Explanation"). R. 89–101. In the Initial Explanation, Dr. Franyutti noted that Plaintiff suffers from the following severe impairment: major joint dysfunction. R. 94. Additionally, Dr. Franyutti concluded that Plaintiff suffers from the following non-severe impairments: affective disorders and anxiety disorders. R. 94.

In the Initial Explanation, Dr. Franyutti completed a physical residual functional capacity ("RFC") assessment of Plaintiff. R. 97–99. During this assessment, Dr. Franyutti found that while Plaintiff does not possess manipulative, visual or communicative limitations, Plaintiff does possess exertional, postural and environmental limitations. R. 97–99. Regarding Plaintiff's exertional limitations, Dr. Franyutti found that Plaintiff is able to: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday and (5) push and/or pull with no limitations. R. 98. Regarding Plaintiff's postural limitations, Dr. Franyutti found that Plaintiff may: (1) occasionally climb ramps/stairs, (2) never climb

ladders/ropes/scaffolds and (3) occasionally balance, stoop, kneel, crouch and crawl. R. 98. Finally, regarding Plaintiff's environmental limitations, Dr. Franyutti found that, while Plaintiff need not avoid wetness, humidity, noise, "[f]umes, odors, dusts, gases, [and] poor ventilation, etc.," she should avoid concentrated exposure to extreme cold and heat, vibrations and hazardous machinery and heights. R. 99. After completing the RFC assessment, Dr. Franyutti determined that Plaintiff is able to perform light-exertional work with the above limitations. R. 100.

Also in the Initial Explanation, Jeff Harlow, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form. R. 94–97. On this form, Dr. Harlow analyzed the degree of Plaintiff's functional limitations. R. 94–97. Specifically, Dr. Harlow rated Plaintiff's restriction in her difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence or pace as "none." R. 76. Further, Dr. Harlow rated Plaintiff's restriction of activities of daily living and episodes of decompensation as "none." R. 76. Lastly, Dr. Harlow explained that Plaintiff's "Major Depressive Posttraumatic Stress & Panic Disorders are NOT SEVERE because clinical results of the Consultative Evaluation denote that all KEY-Functional Capacities are within normal limits." R. 95.

### b.  Disability Determination Explanation by Porfirio Pascasio, M.D., December 26, 2013

On December 26, 2013, Porfirio Pascasio, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Reconsideration level ("Reconsideration Explanation"). R. 117–33. In the Reconsideration Explanation, Dr. Pascasio agreed with all of Dr. Franyutti's conclusions from the Initial Explanation. Compare R. 89–101 with R. 117–13. Also in the Reconsideration Explanation, G. David

Allen, Ph.D., a state agency psychologist, reviewed Dr. Harlow's Psychiatric Review Technique form from the Initial Explanation. R. 124–27. Dr. Allen agreed with and affirmed all of Dr. Harlow's conclusions. <u>Compare</u> R. 94–95 <u>with</u> R. 124–25.

## C. Testimonial Evidence

### 1. Plaintiff's Testimony

During the administrative hearing on September 1, 2015, Plaintiff testified regarding her work history. Most recently, Plaintiff worked part time at Goodwill in 2010, 2012, 2013 and 2014. R. 39. On average, Plaintiff worked approximately twenty to twenty-five hours a week and lifted approximately thirty to forty pounds. R. 39. Before that, Plaintiff worked as a veterinary assistant, dental assistant, census taker, farmhand, material handler and service technician. R. 39–41, 63–65.

Plaintiff also testified that she suffers from multiple physical ailments and related physical limitations. Specifically, Plaintiff testified that she has difficulty buttoning buttons and sometimes picking up coins. R. 42. She can only walk for approximately three to five minutes without having to stop. R. 47. Similarly, Plaintiff can only sit or stand for approximately one to three minutes before having to rest or change positions. R. 47. In addition, Plaintiff testified that she cannot lift more than ten pounds, she cannot lift her arms above her head and she cannot look up or down for long periods of time. R. 44. Further, she cannot lift a gallon of milk with either hand individually or brush her hair with her left hand. R. 45–46. Plaintiff, however, does not use a cane or other device to assist her when walking. R. 42.

Finally, Plaintiff briefly testified regarding her daily living activities. In general, Plaintiff said that she cooks a couple times a week, usually things that are "easy." R. 48.

She does not lift any pots and pans, but she loads and unloads the dishwasher. R. 48. Plaintiff also sweeps and mops "[o]nce every couple months." R. 48, 49. In addition, Plaintiff lives with her fiancé, who helps her with household chores. R. 48. On a regular day, Plaintiff wakes up, has a cup of coffee and takes her medicine. R. 49. Plaintiff's pain medication consists of two Morphine and four Percocets a day. R. 49. Plaintiff also smokes half a pack to one pack of cigarettes a day. R. 49.

### 2. Medical Expert Testimony

David Evon Owens, M.D., an impartial medical expert, testified during the administrative hearing. R. 41–42, 57–62. After asking Plaintiff a few clarifying questions and being qualified as an expert, Dr. Owens testified that Plaintiff's physical impairments do not meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 25, 42, 60. In addition, Dr. Owens testified that, "[b]ased on the totality of the medical record," he believes Plaintiff can lift and carry ten pounds occasionally and five pounds frequently. R. 60. She can sit for six hours and walk and stand for two hours in an eight-hour day. R. 60. She can occasionally climb ramps and stairs but not ladders or scaffolding. R. 60. In addition, Dr. Owens testified that he believes Plaintiff can do postural activities and foot and hand controls occasionally. R. 60. She also can do most manipulations on an occasional basis, including fingering and handling. R. 68.

Gary Bennett, M.D., a second impartial medical expert who is a licensed clinical psychologist, a certified chemical dependency counselor and a certified rehabilitation counselor, R. 3, also testified during the administrative hearing, R. 42–43, 51–57. After being qualified as an expert, Dr. Bennett similarly testified that Plaintiff's mental

impairments do not meet or equal any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 25, 43, 53. To come to this conclusion, Dr. Bennett noted Plaintiff's GAF scores[2] were consistently "around 65, which is in the middle of the mild range of severity." R. 53. There was no evidence showing that Plaintiff's mental impairments were "more severe than a moderate level of severity." R. 53–54. Further, her treatment records indicated that she was doing well, suffering fewer panic attacks and responding positively to medication. R. 54. In the context of daily living, Dr. Bennett testified that Plaintiff's reported difficulties are "more of a function of her physical condition than the mental health condition." R. 54. In terms of social functioning, Dr. Bennett testified that Plaintiff's anxiety and panic attacks may pose a problem but there was no evidence to suggest that it "[w]ould be more than a moderate limitation." R. 55. Furthermore, Dr. Bennett testified that there was no evidence to suggest Plaintiff had a listing level impairment in terms of her concentration, persistence or pace. R. 55. Plaintiff's immediate memory, recent memory and remote memory were assessed as "good." R. 55. Accordingly, Dr. Bennett testified that Plaintiff's functional limitation with concentration, persistence or pace is, at worst, moderate. R. 56. Finally, Dr. Bennett saw no evidence of episodes of decompensation. R. 55. Based on this evidence, Dr. Bennett recommended that Plaintiff be limited to simple and repetitive tasks with

---

[2] "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." <u>Vargas v. Lambert</u>, 159 F.3d 1161, 1164 n. 2 (9th Cir. 1998). "A GAF score between 51 to 60 describes 'moderate symptoms' or any moderate difficulty in social, occupational, or school functioning." <u>Garrison v. Colvin</u>, 759 F.3d 995, 1002 n. 4 (9th Cir. 2014). A GAF score between 61 to 70 describes "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." Global Assessment of Functioning (GAF) Scale, Centre for Innovation in Campus Mental Health, http://toolkit.campusmentalhealth.ca/wp-content/uploads/2015/11/GAF-scale.pdf.

occasional interactions with co-workers and supervisors but no interactions with the general public. R. 57.

## D.    Vocational Evidence

### 1.  Vocational Testimony

Marilyn J. Stroud, an impartial vocational expert, also testified during the administrative hearing. R. 62–68. Initially, Ms. Stroud identified the title, exertional level and the skill level of each job Plaintiff performed over the last fifteen years. R. 63–65. Ms. Stroud testified that Plaintiff's most recent work at Goodwill, where Plaintiff worked during her alleged period of disability, "would fall under sales person, general merchandise . . . ." R. 64. In addition, Ms. Stroud testified that although it was listed as "an SVP skill level of 3[] and a light exertional level under the DOT," Plaintiff performed that job "more at a medium [exertional] level," which "is common in retail business." R. 64.

After addressing Plaintiff's past relevant work, the ALJ presented Ms. Stroud with several hypotheticals for her consideration. R. 65–68. First, the ALJ asked if an individual like Plaintiff could return to her "past work, as she actually performed it or as it is customarily performed in the national economy" if she has the RFC to perform work with the following limitations:

> Lifting and carrying no more than ten pounds occasionally, five pounds frequently; standing and walking no more than two hours in an eight-hour day; sitting for no more than six hours in an eight-hour day -- workday -- at one time without interruption. No more than one hour of each of those.
>
> Occasional climbing ramps and stairs, balancing, kneeling, stooping, crouching; but never exposure to hazardous machinery, work at unprotected heights or around moving machinery parts, climbing ladders, ropes, scaffolds or work on vibrating surfaces or crawling. The individual will need to

> avoid concentrated exposure to extreme cold temperatures, hot temperatures, and . . . avoid concentrated vibrations.
>
> And work that is simple, repetitive, and unskilled that involves occasional interaction with co-workers and supervisors, but the individual is able to respond appropriately to supervision, co-workers, and usual work situations; and no interactions with the general public.

R. 65–66. Ms. Stroud testified that said person would not be able to return to Plaintiff's past work. R. 66. Next, the ALJ asked if other jobs existed in the national or regional economies that said person could perform given Plaintiff's age, education, past work experience, and the limitations set forth in question one. R. 66. Ms. Stroud testified that there are: The individual could work as a stocker, addresser or surveillance monitor, each at the sedentary exertional level. R. 66–67.

Third, the ALJ asked if the individual could return to her past relevant work with the additional limitation of "[o]ccasional handling, feeling, and fingering; and occasional reaching overhead." R. 67. Ms. Stroud confirmed that the individual could not. Fourth, the ALJ asked if other jobs existed in the national or regional economy that said person could perform given Plaintiff's age, education, past work experience and the limitations in hypotheticals one and three. R. 67. Ms. Stroud testified that the only job that would remain available with the added conditions posed in hypothetical three would be sedentary work as a surveillance monitor. R. 67. Lastly, Ms. Stroud testified that no work would remain available if the person had more than one unexcused absence from work a month. R. 67–68.

Plaintiff's counsel did not have any questions for Ms. Stroud.

## 2. Disability Reports

On an undated Disability Report completed by Mark F. Underwood, Plaintiff's attorney at the time, Plaintiff declared that she suffers from multiple impairments that limit her ability to work. R. 319. Specifically, Plaintiff declared that the following impairments limit her ability to work: (1) anxiety, carpal tunnel, neck and back pain, depression; (2) anxiety; (3) carpal tunnel; (4) neck and back pain; (5) panic disorder; (6) depression; and (7) fibromyalgia. R. 319. Although Plaintiff claimed that her conditions first started bothering her on June 30, 2009, she reported that her conditions have not caused her to change her work activity. R. 320. In fact, at the time she completed the disability report, Plaintiff reported that she was still working. R. 319. Next, Plaintiff stated that she received medical treatment for her mental and physical conditions. R. 322. The medicine Plaintiff was receiving at the time for her mental and physical conditions was (1) Celebrex (fibromyalgia), (2) Flexeril (muscle spasms), (3) Klonopin (anxiety/panic attacks), (4) Percocet (pain), (5) Prozac (anxiety) and (6) Vicodin (pain). R. 322.

On a second undated Disability Report, Plaintiff reported "increased pain throughout [her] body and increased fatigue." R. 356. In addition, Plaintiff reported that she has a small nodule on her ovaries. R. 356. Plaintiff, however, did not report experiencing any changes in her daily activities or personal care that were caused by those changes in her physical condition. R. 359. Rather, Plaintiff confirmed that physical limitations remained the same as previously reported. R. 359. The medicine Plaintiff was receiving at the time for her mental and physical conditions was (1) Atorvastatin Calcium (high cholesterol), (2) Celebrex (fibromyalgia), (3) Flexeril (muscle spasms),

(4) Ibuprofen (pain), (5) Klonopin (anxiety), (6) Naproxen (pain) and (7) Prozac (anxiety). R. 358.

**E.     Lifestyle Evidence**

**1.  Adult Function Report**

Plaintiff completed two adult function reports, one on May 10, 2013, and another on October 29, 2013. R. 327–34, 340–47.

In her first report, Plaintiff said that she is unable to work because (1) she has back and neck pain and (2) her arms, shoulders and hands go numb. R. 327. Despite those limitations, Plaintiff reported that her daily activities include going to work at Goodwill, taking care of her dog (sometimes with the assistance of her fiancé) and caring for her personal hygiene. R. 328; <u>see also</u> R. 48. Further, Plaintiff reported that she cooks when she feels good, does laundry so long as someone carries it, gets outside "a lot" and shops for groceries. R. 329–30. In her spare time, Plaintiff spends time with her Aunt. R. 219.

In addition, Plaintiff described how her impairments impact her ability to do certain physical activities. R. 328–34. For example, Plaintiff states that she cannot vacuum, wash floors and windows, paint, mow or garden. R. 328, 334. She cannot brush the hair on the back of her head. R. 328. She cannot lift pans, fish, do crafts, or play volleyball and horseshoes. R. 329, 331. Finally, she cannot lift more than five pounds, look up or reach her neck. R. 332. That said, Plaintiff reports that she does not use crutches, cane, walker, wheelchair or the like. R. 333.

In her second report, Plaintiff said she is unable to work because (1) she cannot lift, bend or raise her hands over her head; (2) her legs give out; (3) her neck gives her

severe headaches; and (4) she cannot sit or stand for long periods of time. R. 340.
Despite those limitations, Plaintiff's daily activities include drinking coffee, watching TV
and eating breakfast. R. 341. She no longer cares for an animal. R. 341. She cares for
her personal hygiene, prepares food daily and does laundry if someone carries it for
her. R. 341–42. She goes outside "[d]aily" and goes grocery shopping about twice a
month.

Also, Plaintiff described how her impairments impact her ability to do certain
physical activities. R. 341–46. For example, Plaintiff states that she cannot clean, do
housework, bake or drive for long period of time. R. 341–42. She does not do much to
care for her hair because it hurts her shoulders. R. 341. She has to sit to shave and has
trouble standing up after using the bathroom. R. 341. She cannot lift things and it hurts
to stand and walk. R. 345. Finally, she no longer socializes because she is always tired
and wants to be left alone. R. 345. That said, Plaintiff reports that she does not use
crutches, cane, walker, wheelchair or the like. R. 346.

### 2. Personal Pain Questionnaire

On August 29, 2013, Plaintiff completed a personal pain questionnaire, where
she reported experiencing pain in her back, neck, hip, shoulders and arms. R. 335–39.
Plaintiff characterized her (1) back and neck pain as aching, stabbing and stinging; (2)
hip pain as aching, stabbing and throbbing; and (3) shoulder and arm pain as aching,
crushing, stabbing, stinging and throbbing. R. 335–37. Generally, Plaintiff's back, neck
and hip pain occurs three or four times an hour and lasts all day, whereas Plaintiff's
shoulder and arm pain occurs continuously and lasts all day. R. 335–37. To make the
pain go away, Plaintiff lies down and takes pain medication. R. 335–37.

# IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following

criteria:

> [The] individual . . . [must have a] physical or mental impairment or
> impairments . . . of such severity that he is not only unable to do his
> previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such work exists in
> the immediate area in which he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if he applied for work. . . .
> '[W]ork which exists in the national economy' means work which exists in
> significant numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). The Social Security Administration uses the

following five-step sequential evaluation process to determine whether a claimant is

disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing
> substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your
> impairment(s). If you do not have a severe medically determinable physical
> or mental impairment that meets the duration requirement [of twelve
> months] . . . or a combination of impairments that is severe and meets the
> duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your
> impairments(s). If you have an impairment(s) that meets or equals one of
> our listings . . . and meets the duration requirement, we will find that you
> are disabled.

> [Before the fourth step, [your RFC] . . . is evaluated "based on all the
> relevant medical and other evidence in your case record . . . ."]

> (iv) At the fourth step, we consider our assessment of your [RFC] and your
> past relevant work. If you can still do your past relevant work, we will find
> that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your [RFC] and
> your age, education, and work experience to see if you can make an

adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. <u>Richardson v. Califano</u>, 574 F.2d 802, 804 (4th Cir. 1978). Once the claimant so proves, the burden of proof shifts to the Commissioner at step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. <u>Hicks v. Gardner</u>, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled during any of the five steps, the process will not proceed to the next step. 20 C.F.R. §§ 404.1520, 416.920.

## V.    ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the Social Security Administration's five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520 (2000), ALJ Page made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2. The claimant has not engaged in substantial gainful activity since June 30, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
. . .

3. The claimant has the following severe impairments: neck and back disorders, carpel tunnel syndrome, affective disorders and anxiety disorders, cannabis dependence, a history of right shoulder surgery, hand tremors, and wrist and elbow neuropathy (20 CFR 404.1520(c) and 416.920(c)).
. . .

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in

20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

. . .

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), with the following exceptions. She can lift or carry 10 pounds occasionally and 5 pounds frequently. In an 8-hour workday, she can sit 6 hours but at one time without interruption one hour; stand 2 hours and walk 2 hours. She can never crawl or climb ladders, ropes or scaffolds, work around hazardous machinery, with moving parts. She can occasionally balance, stoop, crouch, kneel, and climbs ramps and stairs. She can occasionally reach overhead, finger, feel, and handle. She needs to avoid unprotected heights, vibrations, and concentrated exposure to temperature extremes. She is limited to simple, repetitive unskilled work that does not require interaction with the general public, and only requires occasional interaction with coworkers, supervisors and the public. She is able to respond appropriately to supervision, coworkers and usual work situations.

. . .

6.    The claimant in unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

. . .

7.    The claimant was born on April 23, 1969 and was 40 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the

claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

. . .

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 30, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

R. 21–29.

# VI. <u>DISCUSSION</u>

## A. Contentions of the Parties

In her Motion for Summary Judgment, Plaintiff contends that the ALJ's decision is not supported by substantial evidence and is erroneous as a matter of law. ECF No. 12 at 1. Specifically, Plaintiff submits that the ALJ: (1) did not follow the proper procedure when she assessed Plaintiff's mental impairments and (2) erroneously assessed Plaintiff's RFC. Mem. Supp. Pl.'s Mot. Summ. J. 5, 9, ECF No. 14. Based on the alleged errors, Plaintiff requests that the Court grant her summary judgment or, alternatively, remand her case for further proceedings. ECF No. 12 at 1.

Conversely, the Commissioner argues that the ALJ's decision is supported by substantial evidence. ECF No. 15 at 1. Addressing Plaintiff's arguments for summary judgment, the Commissioner avers that: (1) the ALJ followed the proper procedure when analyzing Plaintiff's mental impairments and (2) the ALJ's RFC assessment is supported by substantial evidence. Def.'s Br. Supp. Mot. Summ. J. 2, 5, ECF No. 16.

Accordingly, the Commissioner requests that the Court affirm the ALJ's decision. ECF No 15. at 1.

**B.    Scope of Review**

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether the ALJ applied the proper legal standards and whether the ALJ's factual findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). A "factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Likewise, a factual finding by the ALJ is not binding if it is not supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is "'such relevant evidence as a reasonable mind might accept to support a conclusion.'" Id. (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the United States Court of Appeals for the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). When determining whether substantial evidence exists, a court must "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the ALJ['s]." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005).

**C.     The ALJ's Decision is Supported by Substantial Evidence**

**1.     The ALJ Followed the Proper Procedure and Satisfied Her Basic Duty of Explanation When Analyzing Plaintiff's Mental Impairments**

Plaintiff argues that the ALJ did not follow the "special technique" set forth in 20 C.F.R. §§ 404.1520a and 416.920a when she evaluated Plaintiff's mental impairments at steps two and three of the sequential evaluation process. ECF No. 14 at 5–9.

"When a claimant asserts a mental impairment as a basis for disability, the [Social Security Administration] is required to employ a 'special technique,' unique to mental impairments, to determine severity." Perry v. Colvin, No. 2:15-cv-01145, 2016 WL 1183155, at *3 (S.D. W. Va. Mar. 28, 2016) (citing 20 C.F.R. § 404.1520a(a)). "This 'special technique' is employed at steps two and three of the sequential evaluation to determine the severity of a claimant's mental impairments." Id. (citations omitted).

At step two of the sequential evaluation process, the ALJ must determine whether the claimant has an impairment, or combination of impairments, that is severe. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). "An impairment is considered 'severe' if it significantly limits a claimant's ability to do work-related activities." Miller v. Colvin, No. 2:13–cv–31251, 2015 WL 917772, at *11 (N.D. W. Va. Mar. 3, 2015) (citing 20 C.F.R. §§ 404.1520(a), 416921(a); SSR 96–3p, 1996 WL 374181, at *1 (July 2, 1996)). If the ALJ determines that the claimant suffers from one severe impairment, or combination of impairments, the ALJ must proceed to the third step of the evaluation process. Miller, 2015 WL 917772, at *11. Because the ALJ determined that Plaintiff suffers from two severe mental impairments (affective and anxiety disorders), the ALJ properly proceeded to step three of the sequential evaluation process.[3] R. 22–23.

_____

[3] To the extent Plaintiff challenges the omission of some other severe mental impairment at step two of

At step three, the ALJ must determine the severity of the claimant's mental impairments by determining whether the claimant's mental impairments meet or equal one of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "When evaluating whether a claimant meets one or more of the listed impairments, the ALJ must identify the relevant listings and then compare each of the listed criteria to the evidence of the claimant's symptoms." Pierce, 2015 WL 136651, at *20 (citing Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986)). "Cook, however, does not establish an inflexible rule requiring an exhaustive point-by-point discussion in all cases." Russell v. Chater, No. 94–2371, 1995 WL 417576, at *3 (4th Cir. July 7, 1995).

"The ALJ's duty of explanation is satisfied when he provides findings and determinations sufficiently articulated to permit meaningful judicial review." Pierce, 2015 WL 136651, at *20 (citing DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983)); see also Meador v. Colvin, No. 7:13–CV–214, 2015 WL 1477894, at *3 (W.D. Va. Mar. 27, 2015) ("What is required is that the ALJ's decision has a sufficient discussion of the evidence and explanation of its reasoning such that meaningful judicial review is possible." (citation omitted)). Indeed, "even '[a] cursory explanation' at step three may prove 'satisfactory so long as the decision as a whole demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence to support the conclusion.'" Knickrehm v. Colvin, No. 5:15-CV-00625-D, 2017 WL 685596, at *4

---

the evaluation process, the ALJ's error—if any—is harmless because the ALJ nevertheless proceeded to step three of the evaluation process. Miller, 2015 WL 917772, at *11 ("Courts in this circuit have held that failing to list a severe impairment at the second step of the process generally is not reversible error as long as the process continues and any functional effects of the impairment are appropriately considered during the later steps." (compiling cases)).

(E.D.N.C. Jan. 10, 2017) (alteration in original) (quoting <u>Meador</u>, 2015 WL 1477894, at *3).

> Thus, "remand is not warranted . . . 'where it is clear from the record which [L]isting . . . was considered, and there is elsewhere in the ALJ's opinion an equivalent discussion of the medical evidence relevant to the [s]tep [t]hree analysis which allows [the reviewing court] readily to determine whether there was substantial evidence to support the ALJ's [s]tep [t]hree conclusion.'"

<u>Meador</u>, 2015 WL 1477894, at *3 (alterations in original) (quoting <u>Dunford v. Astrue</u>, BPG–10–0124, 2012 WL 380057, at *3 (D. Md. Feb. 3, 2012) (quoting <u>Schoofield v. Barnhart</u>, 220 F. Supp. 2d 512, 522 (D. Md. 2002))).

In addition, "[t]he plaintiff bears the burden of proving that he meets all of the requirements of a listing."[4] <u>Pierce v. Colvin</u>, No. 5:14CV37, 2015 WL 136651, at *20 (N.D. W. Va. Jan. 9, 2015) (citing 20 C.F.R. §§ 404.1512(a), 404.1525(c)(3), 416.912(a), 416.925(c)(3)). "As a result, a claimant must present medical findings equal in severity to all the criteria for that listing: '[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify.'" <u>Knickrehm</u>, 2017 WL 685596, at *4 (alteration in original) (quoting <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530–31 (1990)).

---

[4] Although the Social Security Act defines "disability" as the "inability to engage in any <u>substantial</u> gainful activity by reason of any medically determinable physical or mental impairment," 42 U.S.C. § 423(d)(1)(A) (emphasis added), "[t]he listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing <u>any</u> gainful activity, not just <u>substantial</u> gainful activity," <u>Zebley</u>, 493 U.S. at 532 (1990) (first alteration in original) (citing 20 C.F.R. § 416.925(a)).

> The Supreme Court of the United States has explained that:

> The reason for this difference between the listings' level of severity and the statutory standard is that, for adults, the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary. That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without a determination whether he actually can perform his own prior work or other work.

<u>Zebley</u>, 493 U.S. at 532 (citing <u>Bowen v. Yuckert</u>, 482 U.S. 137, 141 (1987)).

Here, Plaintiff argues that the ALJ

> failed to evaluate [] Plaintiff's pertinent symptoms, signs, and
> laboratory findings to determine whether she had a medically
> determinable impairment; failed to specify symptoms, signs,
> and laboratory findings that substantiated the presence of
> the impairment, and document her findings, and failed to
> explain her rating of the degree of functional limitation in the
> four required broad areas of function.

ECF No. 14 at 9. Consequently, Plaintiff claims that the ALJ "failed to properly evaluate

[] Plaintiff's mental impairment, and his [sic] decision defies review." Id.

As a threshold matter, the undersigned notes that Plaintiff does not challenge the

ALJ's step two conclusion that Plaintiff suffers from severe affective and anxiety

disorders, nor does she challenge the ALJ's step three conclusion that those mental

impairments do not meet or medically equal the severity of the impairments listed in 20

C.F.R. Part 404, Subpart P, Appendix 1. Id. Rather, Plaintiff argues that the ALJ failed

to conduct a sufficiently detailed analysis explaining why Plaintiff's mental impairments

do not satisfy the listed impairments and that failure, therefore, precludes judicial

review. Id. This argument is unavailing for three reasons.

First, the ALJ's analysis of Plaintiff's mental impairments does not frustrate

meaningful review because the ALJ sufficiently articulated her findings and

determinations, satisfying her basic duty of explanation.[5] R. 22–23. Here, the ALJ

identified two listings, listing 12.04 ("Affective Disorders") and 12.06 ("Anxiety Related

---

[5] Because the undersigned concludes that the ALJ satisfied her basic duty of explanation, the
undersigned need not address whether the ALJ compared the individual listing criteria against the
evidence of Plaintiff's symptoms. See Pierce, 2015 WL 136651, at *20 ("The ALJ's duty of explanation is
satisfied when he provides findings and determinations sufficiently articulated to permit meaningful
judicial review." (citing DeLoatche, 715 F.2d at 150)); Knickrehm, 2017 WL 685596, at *4 ("[E]ven '[a]
cursory explanation' at step three may prove 'satisfactory so long as the decision as a whole
demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence
to support the conclusion.'" (second alteration in original) (quoting Meador, 2015 WL 1477894, at *3)).

Disorders"), that were relevant to Plaintiff's severe mental impairments.[6] "A claimant meets or medically equals Listing 12.04 or Listing 12.06 if [s]he exhibits the criteria in Paragraph A and Paragraph B, or the criteria in Paragraph C." Knickrehm, 2017 WL 685596, at *5 (citing 20 C.F.R. Part 404, Subpart P, Appendix 1 §§ 12.04, 12.06).

> The Paragraph B criteria for Listing 12.04 and Listing 12.06 are the same: the claimant must have at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social function; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.

Id. (citing same). Listings 12.04 and 12.06, however, do not have the same Paragraph C criteria.

> In order to meet the Paragraph C criteria for Listing 12.04, the claimant must have a "[m]edically documented history of a chronic affective disorder of at least [two] years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support," along with either (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Id. (alteration in original) (internal citations omitted) (quoting 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.04). "In order to meet the Paragraph C criteria for Listing 12.06, the claimant must be completely unable to function independently outside of his home." Id. (emphasis added) (citing 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.06).

---

[6] The ALJ also identified Listing 12.09, R. 22, but that is not a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1 and is, therefore, excluded from the Court's analysis.

Here, the ALJ concluded that Plaintiff's mental impairments do no satisfy the Paragraph B criteria because Plaintiff has (1) no restriction in daily living, (2) moderate difficulties in social functioning, (3) moderate difficulties in concentration, persistence or pace and (4) experienced no episodes of decompensation. R. 23. In support, the ALJ explained that Plaintiff reported that "she prepared simple meals daily, went outside daily, drove a car, could go out alone, shopped in stores, could manage money, had no problems getting along with authority figures, neighbors, friends and family, and followed spoken instructions ok." R. 23. In addition, the ALJ explained that Plaintiff worked after her alleged disability onset date at a warehouse where she worked for approximately twenty to twenty-five hours a week and regularly lifted fifty to sixty pounds. R. 23. Similarly, the ALJ concluded that the evidence shows that Plaintiff's mental impairments do not satisfy the Paragraph C criteria because Plaintiff "performs her daily activities independently." R. 23. Because the ALJ had already articulated Plaintiff's daily activities when determining whether Plaintiff's mental impairments satisfied the Paragraph B criteria, the ALJ did not need to rehash that evidence when determining whether the Paragraph C criteria were met. Accordingly, the undersigned concludes that the ALJ's step three analysis does not frustrate meaningful review because the ALJ sufficiently articulated her reasoning for why Plaintiff's mental impairments do not meet or equal a listed impairment.

Second, even if the ALJ did not meet her basic duty of explanation at step three, the ALJ's analysis at subsequent steps plainly provides substantial evidence to support the finding that Plaintiff's mental impairments do not meet or equal a listing impairment. Smith v. Astrue, 457 F. App'x 326, 328 (4th Cir. 2011) (citing Fischer–Ross v. Barnhart,

431 F.3d 729, 733–34 (10th Cir. 2005)) (holding that ALJ's step three conclusion that Plaintiff's impairment did not meet or equal a listing impairment was supported by substantial evidence when decision was read as a whole); see also Kiernan v. Astrue, No. 3:12CV459–HEH, 2013 WL 2323125, at *6 (E.D. Va. May 28, 2013) ("Where the ALJ analyzes a claimant's medical evidence in one part of his decision, there is no requirement that he rehash that discussion in his Step 3 analysis." (citing Smith, 457 F. App'x at 328)). Specifically, the ALJ's RFC determination at step four remedies any deficiency in the ALJ's explanation at step three. See R. 24–28.

At step four, the ALJ analyzed a host of evidence regarding Plaintiff's mental impairments and explained how much weight the ALJ gave that evidence and why. R. 24–27. For example, the ALJ gave great weight to the testimony of Dr. Bennett, one of the medical experts who reviewed the evidence of record and testified at Plaintiff's administrative hearing. R. 25, 27. Specifically, the ALJ noted Dr. Bennett's testimony that Plaintiff's records dating back to her "September 2012 initial mental evaluation showed mild to moderate mental symptoms." R. 25. In fact, the ALJ noted that Dr. Bennett testified that Plaintiff's therapy records focused on her medications rather than her mental state. R. 25. Although Dr. Bennett testified that Plaintiff's "anxiety and panic attacks might have a moderate effect on her ability to work," the ALJ noted that Dr. Bennett also testified that the evidence "contained little indication of a concentration impairment." R. 25 (emphasis added). Finally, the ALJ noted that Dr. Bennett concluded that Plaintiff "retained the ability to perform simple repetitive tasks, in a work environment that only required occasional interaction with coworkers and no interaction with the public." R. 25.

In addition, the ALJ explained why she gave little weight to the May 15, 2013, mental assessment completed by Jafar Taki Almashat, M.D. R. 26. The ALJ noted that Dr. Almashat, began treating Plaintiff on February 20, 2013, and "diagnosed her with panic disorder, major depressive disorder, PTSD, Cannabis dependence in sustained full remission, and alcohol dependence in sustained partial remission." R. 26. Dr. Almashat further assessed Plaintiff with related limitations that would preclude performance for at least 15% of the workday. R. 26. For example, Dr. Almashat opined that Plaintiff "would be off task 25% of the workday, would likely miss 3 workdays a months, would be unable to complete an 8-hour workday 3 days a month, and that she could perform her work duties efficiently less than 50% of the time." R. 26.

However, the ALJ explained that Dr. Almashat's assessments were inconsistent with the GAF[7] score of 65 that he gave Plaintiff, the content of his assessment and his other treatment records. R. 26. Indeed, the ALJ explained why each of "Dr. Almashat's treatment notes do not support his limitations for [Plaintiff]." R. 26. For example, the ALJ explained that the notes from Plaintiff's initial evaluation documents her medications and self-reported history, but does not indicate significant mental symptoms. R. 26. Rather, Dr. Almashat observed that Plaintiff "was alert and oriented x3, appropriately dressed with good hygiene, and denied suicidal and homicidal ideations and psychosis." R. 26. He also assessed Plaintiff with a GAF score of 60. R. 26. Next, the ALJ explained that on March 20, 2013, Plaintiff "had good eye contact," seemed "brighter" and Plaintiff "reported feeling better." R. 26. Dr. Almashat "noted no significant mental symptoms" and gave her GAF score of 65. R. 26. The ALJ noted that on September 13, 2013, Dr.

---

[7] See supra note 2.

Almashat observed Plaintiff as "alert and oriented x3, cooperative," she "had an appropriate affect, no suicidal or homicidal ideations and no psychosis." R. 26.

Then, the ALJ explained that on December 17, 2013, Dr. Almashat noted Plaintiff reported "doing well and had no medication side effects. She was stable on medications. She reported only one panic attack since her last visit and stated Klonopin relieved it." R. 26. In addition, Dr. Almashat noted that "[h]er thought process was linear and goal oriented, her speech was normal, her mood was good, she was alert and oriented x3, and had good insight and judgment." R. 26. He assessed Plaintiff with a GAF score of 65. R. 26. Finally, the ALJ noted that Dr. Almashat's mental status assessments and GAF scores of Plaintiff were essentially the same through August 25, 2014, "and indicated no significant mental functional limitations." R. 26. Further, at step four, the ALJ reiterated and considered the fact that Plaintiff worked part-time in 2013 and "reported lifting 50 to 60 pounds while unloading trucks." R. 27. Plaintiff also "reported that she prepared meals daily and other activities, shopped in stores, could manage money, followed spoken instructions ok, and could get along with others." R.27

Based on the foregoing, the undersigned hereby concludes that the ALJ's step four analysis—which discusses the evidence relevant to Plaintiff's mental impairments in legion—plainly remedies the deficiency in the ALJ's step three analysis, if any.

Third, the undersigned finds that Plaintiff has not satisfied her burden of showing that she meets all of the requirements of a listing. Although she takes issue with the ALJ's step three explanation, Plaintiff has not identified what listing criteria the ALJ failed to consider or, for that matter, any evidence demonstrating that Plaintiff suffers from a mental impairment that meets or equals an impairment listed in Appendix 1. See

ECF No. 14 at 5–9. Nor could she. After carefully reviewing the record, the undersigned could not discern any evidence showing that Plaintiff reported any mental symptoms or conditions that would meet or equal a listed impairment. Indeed, the only basis that arguably supports such a conclusion is the mental assessment completed by Dr. Almashat on May 15, 2013, which the ALJ noted is inconsistent with Dr. Almashat's other treatment records. R. 26. Unsurprisingly, the ALJ gave this single assessment little weight. R. 26. Given there is ample evidence in the record supporting the ALJ's determination that Plaintiff's mental impairments do not meet or equal a listing, including Listings 12.04 and 12.06, and the ALJ thoroughly discussed that evidence, the undersigned concludes that the ALJ met her basic duty of explanation and, therefore, the ALJ's decision does not preclude meaningful judicial review.

### 2. The ALJ's Assessment of Plaintiff's Residual Functional Capacity is Supported by Substantial Evidence

Next, Plaintiff argues that the ALJ's RFC determination did not include the requisite function-by-function analysis because (1) the ALJ did not properly account for Plaintiff's difficulties with concentration, persistence or pace and (2) the ALJ did not properly consider all of the evidence of record. ECF No. 14 at 11–13. In support, Plaintiff directs the Court's attention to Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015), which, according to Plaintiff, requires us to remand the case to the ALJ. ECF No. 14 at 11–13.

As a threshold matter, the undersigned notes that Plaintiff's argument is based on a thorough misunderstanding of the Fourth Circuit's holdings in Mascio and is logically untenable. Whether the ALJ conducted the requisite function-by-function analysis is a separate and distinct legal issue from whether the ALJ properly accounted

for Plaintiff's mental limitations and whether the ALJ properly considered all relevant evidence of record. In other words, there will be instances where an ALJ conducted the requisite function-by-function analysis, but the ALJ erred because he or she did not properly account for a plaintiff's mental limitations the RFC. Likewise, there will be instances where an ALJ conducted the requisite function-by-function analysis, but the ALJ erred because he or she did not consider all of the relevant evidence of record when determining the plaintiff's RFC. The ALJ's function-by-function analysis is not deficient because the RFC does not properly account for a plaintiff's mental limitations or the ALJ failed to consider relevant evidence of record. Rather, an ALJ's function-by-function analysis is deficient—according to Mascio—if the ALJ does not "'first identify the individual's [relevant] functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." Mascio, 780 F.3d at 636 (footnote omitted) (quoting SSR 96-8p, 1996 WL 374184 (July 2, 1996)). Or, an ALJ's assessment will be deficient if it does not "'include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" Id. (quoting same).

Plaintiff's misunderstanding of Mascio is the result of muddling the Fourth Circuit's analysis of two distinct legal issues in sections II.A and II.B. See id. at 635–38. After explaining how the ALJ's function-by-function analysis in that case was deficient, id. at 635–37, the Fourth Circuit addressed whether "the ALJ presented a legally insufficient hypothetical to the vocational expert," id. at 637; see also id. at 637–38. There, the Fourth Circuit concluded that the hypothetical was legally deficient and

explained "that an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" Id. at 638 (quoting Winschel v. Comm'r Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011)). Further, the Court explained, without hesitation, that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." Id. The Fourth Circuit did not, however, base the ALJ's function-by-function analysis error on the ALJ's failure to properly account for the plaintiff's mental difficulties with staying on task. See id. at 635–38. Nor did the Fourth Circuit base the ALJ's function-by-function analysis error on the ALJ's failure to consider all of the relevant evidence of record. See id. Indeed, the Fourth Circuit, in Mascio, does not even address whether the ALJ considered all of the relevant evidence of record. See generally id. Nor could it, the plaintiff in that case did not argue that alleged error on appeal.[8] See generally id.

With this in mind, the undersigned will address Plaintiff's contention as three separate legal arguments.

### a. The ALJ's Determination of Plaintiff's RFC Does Not Frustrate Meaningful Review

Plaintiff argues that the ALJ failed to conduct the requisite function-by-function analysis. ECF No. 14 at 11–12.

"The process for assessing RFC is set out in Social Security Ruling 96-8p." Monroe v. Colvin, 826 F.3d 176, 187 (4th Cir. 2016) (citing Mascio v. Colvin, 780 F.3d

---

[8] In Mascio, the plaintiff argued that the ALJ erred because the ALJ (1) "did not conduct a function-by-function analysis" when assessing the plaintiff's RFC, (2) "presented a legally insufficient hypothetical to the vocational expert," (3) determined the plaintiff's RFC "before assessing her credibility," and (4) did "not follow[] the so called 'great weight rule' when evaluating her alleged pain." Mascio, 780 F.3d at 635–36, 637, 639, 640.

632, 636 (4th Cir. 2015)); see also SSR 96-8p, 1996 WL 374184 (July 2, 1996). "Under

that ruling, the assessment must first identify the individual's functional limitations or

restrictions and assess his or her work-related abilities on a function-by-function basis,

including the functions listed in the regulations." Monroe, 826 F.3d at 187 (internal

quotations omitted) (citations omitted). The Fourth Circuit has not, however, adopted "a

per se rule requiring remand when the ALJ does not perform an explicit function-by-

function analysis." Mascio, 780 F.3d at 636; cf. Monroe, 826 F.3d at 188. Indeed, the

salient point from the Fourth Circuit's decisions in Mascio and Monroe is "that 'remand

may be appropriate where an ALJ fails to assess a claimant's capacity to perform

relevant functions, despite contradictory evidence in the record, or where other

inadequacies in the ALJ's analysis frustrate meaningful review.'" Monroe, 826 F.3d at

188 (emphasis added) (quoting Mascio, 780 F.3d at 636). Accordingly, this Court must

first determine whether the ALJ failed to assess Plaintiff's capacity to perform relevant

functions. See id. If the ALJ failed to do so, the Court must then determine whether the

ALJ's failure frustrates meaningful review because of contradictory evidence or other

inadequacies in the record. See id. Finally, if the ALJ's failure frustrates meaningful

review, the Court must determine if remanding to the ALJ is appropriate under the

circumstances. See id. The Court addresses the second question, which is dispositive.[9]

Here, the ALJ's determination of Plaintiff's RFC does not frustrate meaningful

review. As discussed above in Section VI.C.1, the ALJ thoroughly explained—based on

the relevant evidence of record—why Plaintiff's mental limitations were no more than

mild or moderate. R. 22–23. In addition, the ALJ further explained, in detail, which

---

[9] The undersigned need not decide whether the ALJ properly conducted the requisite function-by-function analysis because the undersigned nevertheless concludes that the ALJ's determination of Plaintiff's RFC does not frustrate meaningful review.

evidence she gave little or great weight and why. R. 24–28. Because the ALJ thoroughly explained the evidentiary basis for her RFC determination, the undersigned concludes that the ALJ's determination of Plaintiff's RFC does not frustrate meaningful review. Accordingly, the undersigned concludes that the ALJ's error, if any, is harmless.

### b. The ALJ Properly Accounted for Plaintiff's Mental Limitations When Determining Plaintiff's RFC

Plaintiff argues that the ALJ's RFC determination is deficient because the ALJ did not properly account for Plaintiff's mental limitations and, therefore, the Fourth Circuit's decision in Mascio requires remand. ECF No. 14 at 11–12.

Contrary to Plaintiff's belief, however, the ALJ did in fact account for Plaintiff's moderate difficulties in concentration, persistence or pace when determining her RFC. Specifically, the ALJ concluded that Plaintiff

> has the [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), with the following exceptions. She can lift or carry 10 pounds occasionally and 5 pounds frequently. In an 8-hour workday, she can sit 6 hours but at one time without interruption one; stand 2 hours and walk 2 hours. She can never crawl or climb ladders, ropes or scaffolds, work around hazardous machinery, with moving parts. She can occasionally balance, stoop, crouch, kneel, and climb ramps and stairs. She can occasionally reach overhead, finger, feel, and handle. She needs to avoid unprotected heights, vibrations, and concentrated exposure to temperature extremes. She is limited to simple, repetitive unskilled work that does not require interaction with the general public, and only requires occasional interaction with coworkers, supervisors and the public. She is able to respond appropriately to supervision, coworkers and usual work situations.

R. 24.

Again, in Mascio, the Fourth Circuit noted "that an ALJ does not account 'for a claimant's limitation in concentration, persistence, and pace by restricting the

hypothetical question to simple, routine tasks or unskilled work.'" <u>Mascio</u>, 780 F.3d at

638 (quoting <u>Winschel</u>, 631 F.3d at 1180). However, the ALJ did not limit Plaintiff to

work that is just simple, repetitive and unskilled. R. 24. Rather, the ALJ limited Plaintiff

to simple, routine and unskilled work "that does not require interaction with the general

public" and "only requires occasional interaction with coworkers[] [and] supervisors . . .

."[10] R. 24. The first limitation properly addresses Plaintiff's ability to perform <u>simple</u>

<u>tasks</u>—whereas the latter limitations address Plaintiff's ability to <u>stay on task</u>. <u>See</u>

<u>Rayman v. Comm'r Soc. Sec.</u>, No. SAG-14-3102, 2015 WL 6870053, at *3 (D. Md. Nov.

6, 2015) ("While limitation to unskilled work alone is insufficient under <u>Mascio</u>, here the

ALJ included other limitations that clearly account for [the plaintiff]'s moderate limitation

in concentration, persistence, or pace."). Indeed, limiting Plaintiff's interaction with co-

workers, supervisors, and the general public will limit the number of interruptions and

distractions that would exacerbate Plaintiff's difficulties with concentration, persistence

or pace.

 Furthermore, to the extent the ALJ's decision does not explicitly explain how the

limitations imposed in Plaintiff's RFC account for her mental limitations, the ALJ's failure

does not frustrate meaningful review. For example, this case is not like <u>Proctor v.</u>

<u>Colvin</u>, 229 F. Supp. 3d 494 (S.D. W. Va. 2017).

---

[10] Plaintiff correctly notes that the ALJ's RFC determination contradicts itself on its face because the RFC limits Plaintiff to work that does not require interaction with the general public but also requires occasional interaction with the public. <u>See</u> R. 24; ECF No. 14 at 5 n. 2. However, "[t]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate disability determination." <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1038 (9th Cir. 2008). Here, a careful review of the record makes clear that the ALJ only intended to include the former limitation based on the testimonial evidence from Dr. Bennett who said that Plaintiff's mental limitations would be adequately accommodated by limiting her to simple, repetitive and unskilled work with occasional interaction with co-workers and supervisors but no interaction with the general public. R. 56–57. Because the ALJ's error is inconsequential to the ultimate disability determination, the error is harmless. <u>See</u> Pierce, 2015 WL 136651, at *17 (finding harmless error where ALJ appeared to contradict himself but the record made the ALJ's disability determination clear).

In Proctor, the United States District Court for the Southern District of West Virginia remanded a case to an ALJ because the ALJ failed to explain how the RFC limitations addressed the claimant's moderate difficulties in social functioning as well as concentration, persistence or pace. 229 F. Supp. 3d at 499–500. Specifically, the ALJ limited the claimant "to sedentary work and that [the claimant] can only perform jobs that do not require reading or writing above a sixth grade level." Id. at 499. But "[t]he ALJ only concluded, without elaboration, that 'the [RFC] assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.'" Id. at 500 (second alteration in original). There, our sister court reasoned that "the ALJ did not explain his reasons for including a condition that [c]laimant cannot read or write anything above a sixth grade reading level and, in any event, this condition has no direct bearing on [c]laimant's ability to stay on task or interact in a socially appropriate manner with others." Id. Because the ALJ's decision did not include a limitation that clearly addressed the claimant's mental impairment or any related reasoning, the court concluded that it "lack[ed] the ability to meaningfully review the ALJ's decision. Id. (citing Mascio, 780 F.3d at 636–37).

Here, however, the ALJ's failure to specifically explain how the limitations included in Plaintiff's RFC address her mental limitations does not similarly frustrate meaningful review because those limitations logically address Plaintiff's mental impairment. As discussed above, limiting Plaintiff's interaction with co-workers, supervisors, and the general public will limit the number of interruptions and distractions that would exacerbate Plaintiff's difficulties with concentration, persistence or pace. Because the reason for including these limitations is apparent from the limitations

themselves, this Court's meaningful review of Plaintiff's RFC determination is not frustrated. Accordingly, the ALJ's error, if any, is harmless.

Second, to the extent Plaintiff challenges the legal sufficiency of the hypotheticals the ALJ posed to the vocational expert, that argument is similarly unavailing. First, in this case, the hypotheticals posed to the vocational expert are irrelevant because the ALJ had a medical expert, Dr. Bennett, attend the administrative hearing to testify regarding Plaintiff's alleged mental impairments. See R. 51–57. Second, Dr. Bennett's testimony clearly addressed Plaintiff's alleged difficulties with concentration, persistence or pace. See R. 55–57. In that regard, Dr. Bennett testified that there was little objective evidence addressing those alleged difficulties. R. 55. And, Dr. Bennett nevertheless testified that Plaintiff's mental difficulties regarding concentration, persistence and pace were, at worst, moderate and further testified that the primary limitations to address those difficulties would be limiting Plaintiff to (1) simple, repetitive tasks, (2) no interaction with the general public and (3) occasional interaction with coworkers and supervisors. R. 56–57. Based on the foregoing, the undersigned concludes that the ALJ's determination of Plaintiff's RFC properly accounts for Plaintiff's mental limitations.

### c. The ALJ Properly Considered Relevant Evidence of Record

Lastly, Plaintiff insists that the ALJ erred when she failed to consider relevant evidence of record, namely Plaintiff's Functional Capacity Evaluation ("FCE"), because the ALJ did not specifically discuss Plaintiff's scores on the Purdue Pegboard Test and Minnesota Rate of Manipulation Test included in said evaluation. ECF No. 14 at 12–13.

Generally, "[a]n ALJ is required to consider all of the relevant medical evidence submitted by a claimant." Ryman v. Colvin, No. 2:16-CV-37 (BAILEY), 2017 WL 1682588, at *15 (N.D. W. Va. Apr. 17, 2017) (emphasis in original) (citing 20 C.F.R. §

404.1520), adopted, 2017 WL 1734039 (N.D. W. Va. May 2, 2017). "However, an ALJ is 'not obligated to comment on every piece of evidence presented.'" Id. (emphasis in original) (quoting Pumphrey v. Comm'r of Soc. Sec., No. 3:14-CV-71, 2015 WL 3868354, at *3 (N.D. W. Va. June 23, 2015)); see also Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993) ("[T]he ALJ need not evaluate in writing every piece of testimony and evidence submitted." (citing Stephens v. Heckler, 766 F.2d 284, 287 (7th Cir. 1985) and Zblewski v. Schweiker, 732 F.2d 75, 79 (7th Cir. 1984))).

Although the ALJ did not explicitly discuss Plaintiff's scores on the Pegboard and Manipulation tests, the ALJ plainly considered Plaintiff's FCE as a whole. R. 26–27. Indeed, the ALJ discussed the results of Plaintiff's FCE in large paragraph in the ALJ's written decision and explained why she gave that evaluation little weight. R. 26–27. Yet there's more. Plaintiff's difficulty with using her hands was also the subject of a line of questioning from Dr. Owens, a medical expert who testified during the administrative hearing. R. 41–42. There, Plaintiff testified that she has "a little bit of difficulty buttoning buttons[] and sometimes picking up coins." R. 42. She also testified that she can pick up and sort papers but not for a long period of time. R. 42. Unsurprisingly, then, the ALJ included a limitation in Plaintiff's RFC that "[s]he can occasionally reach overhead, finger, feel, and handle." R. 24. This limitation directly contradicts Plaintiff's assertion that the ALJ "never considered the impact of these evaluations upon [] Plaintiff's abilities to perform handling, feeling, and fingering of objects." ECF No. 14 at 13. Accordingly, the undersigned concludes that the ALJ did not err because she properly considered Plaintiff's FCE.

Even if the ALJ did err by failing to discuss those individual test results, the ALJ's error is harmless because it would not change the outcome of the ALJ's disability determination. See McIntire v. Colvin, No. 3:13–CV–143, 2015 WL 4011007, at *48 (N.D. W. Va. Jan. 28, 2015) ("Under the harmless error doctrine, '[t]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination.'" (citations omitted)). Although Plaintiff's Pegboard and Manipulation test results would—when considered alone—weigh in favor of a disability determination, Plaintiff's FCE contained other relevant assessments that do not. For example, the ALJ noted that many of Plaintiff's results were self-limited by complaints of pain. R. 26. Further, the ALJ noted that Plaintiff was assessed with "normal left hand grip strength and right hand grip strength of 37 (normal 47-77)." R. 27. Furthermore, the ALJ noted that Plaintiff "was assessed with slight/no limitation in performing low weighted work activities and some limitation (8-33%) in performing heavy weighted work activities." R. 27. In addition, the ALJ noted that Plaintiff was assessed with "good sitting and standing tolerances, good attention, and functional range of motion with upper and lower extremities." R. 27. Because Plaintiff's Pegboard and Manipulation test results would not alter the ALJ's disability determination, the undersigned concludes that the ALJ's error, if any, is harmless.

## VII.    RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's claims for DIB and SSI is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment [ECF No. 12] be **DENIED**,

Defendant's Motion for Summary Judgment [ECF No. 15] be **GRANTED**, the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made and the basis for such objections. A copy of such objections should also be submitted to the Honorable Gina M. Groh, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. See 28 U.S.C. § 636(b)(1); Wright v. Collins, 766 F.2d 841, 845-48 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); see also Thomas v. Arn, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. In addition, this Report and Recommendation completes the referral from the District Court. The Clerk is directed to terminate the Magistrate Judge association with this case.

Respectfully submitted this 14th day of September, 2017.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE